J-S56014-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| STEVEN ROSSER | : | |
| | : | |
| Appellant | : | No. 2874 EDA 2019 |

Appeal from the Judgment of Sentence Entered May 31, 2019
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0011526-2016

BEFORE: BENDER, P.J.E., KUNSELMAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY BENDER, P.J.E.: Filed: March 11, 2021

Appellant, Steven Rosser, appeals from the judgment of sentence of an aggregate term of 43½-87 years' imprisonment, imposed after a jury convicted him of rape of a child, 18 Pa.C.S. § 3121(c), involuntary deviate sexual intercourse with a child (hereinafter, "IDSI"), 18 Pa.C.S. § 3123(b), unlawful contact with a minor, 18 Pa.C.S. § 6318(a)(1), and endangering welfare of children-guardian, 18 Pa.C.S. § 4304(a)(1). After careful review, we affirm on the basis of the trial court's May 13, 2020 opinion issued pursuant to Pa.R.A.P. 1925(a), with respect to Appellant's sufficiency-of-the-evidence and weight-of-the-evidence claims, and we deem Appellant's sentencing issue waived.

_____

[*] Retired Senior Judge assigned to the Superior Court.

We need not reiterate the procedural history and factual background of this case, as the trial court set forth a comprehensive summary of both in its Rule 1925(a) opinion. *See* Trial Court Opinion (TCO), 5/13/20, at 1-15. On appeal, Appellant raises three issues for our review, which we have re-ordered for ease of disposition:

[1.] Was the evidence insufficient to sustain the guilty verdict for rape of a child as there was insufficient evidence of penetration?

[2.] Were the guilty verdicts for rape of a child, IDSI with a child, and unlawful contact with a minor-sexual offenses, against the weight of the evidence for the following reasons:

1. there was no corroborating evidence of signs of physical trauma found by either law enforcement or medical personnel;

2. there was no eyewitness testimony of any sexual assault, to include Appellant's mother, who for a period of 8 months in 2014, lived with Appellant, the victim, victim's mother and sibling;

3. the victim disliked … Appellant as he would "whip" the victim, and Appellant proffers that this was motive to fabricate; [and]

4. Appellant presented several character witnesses who stated that Appellant enjoyed a good reputation in the community for peacefulness and nonviolence.

[3.] Did the lower court abuse its discretion by fashioning a consecutive sentence that exceeded that which is necessary to protect the public, and seems not to have taken into consideration … Appellant's community and family support, among other mitigating factors?

Appellant's Brief at 5 (footnote omitted).

**Issue 1**

In Appellant's first issue, he challenges the sufficiency of the evidence to sustain his conviction for rape of a child because he says there was insufficient evidence of penetration. The Honorable Anne Marie B. Coyle of the Court of Common Pleas of Philadelphia County accurately and thoroughly addressed this issue in her Rule 1925(a) opinion. We, therefore, adopt her opinion as our own with respect to Appellant's sufficiency claim. *See* TCO at 16-20. Accordingly, Appellant's sufficiency challenge fails.

**Issue 2**

In Appellant's second issue, he argues that his convictions for rape of a child, IDSI, and unlawful contact with a minor were against the weight of the evidence. We apply the following standard of review to weight claims:

> As a general rule, the weight of the evidence is exclusively for the fact finder who is free to believe all, part or none of the evidence and to determine the credibility of the witnesses. We cannot substitute our judgment for that of the finder of fact. We may only reverse the lower court's verdict if it is so contrary to the evidence as to shock one's sense of justice. Moreover, where the trial court has ruled on the weight claim below, our role is not to consider the underlying question of whether the verdict is against the weight of the evidence. Rather, appellate review is limited to whether the trial court palpably abused its discretion.

*Commonwealth v. Castelhun*, 889 A.2d 1228, 1234 (Pa. Super. 2005) (internal citations and quotation marks omitted).

After reviewing the record, the briefs submitted by the parties, the relevant law, and the well-reasoned trial court opinion, we discern no abuse of discretion by the trial court in denying Appellant's weight-of-the-evidence claim. Judge Coyle carefully considered the evidence presented at trial in

evaluating Appellant's weight claim. **See** TCO at 16-23, 25-27.[1] Therefore, no relief is due on this basis.

## Issue 3

Finally, Appellant contends that the trial court "abuse[d] its discretion by fashioning a consecutive sentence that exceeded that which is necessary to protect the public, and seems not to have taken into consideration … Appellant's community and family support, among other mitigating factors[.]" Appellant's Brief at 5. These claims implicate the discretionary aspects of his sentence.

> Challenges to the discretionary aspects of sentencing do not entitle an appellant to review as of right. **Commonwealth v. Sierra**, 752 A.2d 910, 912 (Pa. Super. 2000). An appellant challenging the discretionary aspects of his sentence must invoke this Court's jurisdiction by satisfying a four-part test:
>
> > We conduct a four-part analysis to determine: (1) whether [the] appellant has filed a timely notice of appeal, **see** Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, **see** Pa.R.Crim.P. 720; (3) whether [the] appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.[] § 9781(b).
>
> **Commonwealth v. Evans**, 901 A.2d 528, 533 (Pa. Super. 2006), *appeal denied*, … 909 A.2d 303 ([Pa.] 2006). Objections to the discretionary aspects of a sentence are generally waived if they are not raised at the sentencing hearing or in a motion to modify

---

[1] However, we note that, in reviewing Appellant's conviction for unlawful contact with a minor pursuant to 18 Pa.C.S. § 6318, the trial court mistakenly cited to 18 Pa.C.S. § 3125, which pertains to aggravated indecent assault. **See** TCO at 22. Notwithstanding this error, the trial court's analysis is still correct.

the sentence imposed. ***Commonwealth v. Mann***, 820 A.2d 788, 794 (Pa. Super. 2003), *appeal denied*, … 831 A.2d 599 ([Pa.] 2003).

The determination of what constitutes a substantial question must be evaluated on a case-by-case basis. ***Commonwealth v. Paul***, 925 A.2d 825, 828 (Pa. Super. 2007). A substantial question exists "only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process." ***Sierra***, ***supra*** at 912–13.

***Commonwealth v. Griffin***, 65 A.3d 932, 935 (Pa. Super. 2013) (quoting

***Commonwealth v. Moury***, 992 A.2d 162, 170 (Pa. Super. 2010)).

Here, Appellant has filed a timely notice of appeal.[2] However, he failed to properly preserve the sentencing claims he now presents on appeal at sentencing or in his post-sentence motion. The sentencing transcript reveals that Appellant made no objections after the trial court rendered its sentence. N.T. Sentencing, 5/31/19, at 15-28. Further, while Appellant raised a sentencing claim in his post-sentence motion, he vaguely averred there, without further explanation, that "[t]he sentence of 43½-87 years' incarceration was excessive." Post-Sentence Motion, 6/7/19, at 1

_____

[2] The docket reflects that Appellant's post-sentence motion was denied by operation of law on October 15, 2019. ***See*** Pa.R.Crim.P. 720(A)(2)(b) ("If the defendant files a timely post-sentence motion, the notice of appeal shall be filed … within 30 days of the entry of the order denying the motion by operation of law in cases in which the judge fails to decide the motion[.]"). Appellant filed his notice of appeal on October 4, 2019. Though Appellant filed his notice of appeal prematurely, we consider it timely. ***See*** Pa.R.A.P. 905(a)(5) ("A notice of appeal filed after the announcement of a determination but before the entry of an appealable order shall be treated as filed after such entry and on the day thereof.").

(unnumbered).  Problematically, Appellant did not specifically allege in his post-sentence motion that the trial court's consecutive sentences exceeded that which is necessary to protect the public, and that the trial court did not consider Appellant's community and family support, among other mitigating factors.  Thus, we deem Appellant's sentencing issue waived.  *See* Pa.R.Crim.P. 720(B)(1)(a) (directing that all requests for relief in a post-sentence motion "shall be stated with specificity and particularity"); *Mann*, 820 A.2d at 794 (deeming the appellant's sentencing claim waived where he failed to raise the specific claim at sentencing or in his post-sentence motion); *see also Commonwealth v. Clary*, 226 A.3d 571, 579 n.7 (Pa. Super. 2020) (same).

Nevertheless, even if not waived, we would conclude that Appellant's sentencing claims lack merit.  We are mindful of the following standard of review:

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion.  In this context, an abuse of discretion is not shown merely by an error in judgment.  Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

*Commonwealth v. Johnson-Daniels*, 167 A.3d 17, 28 (Pa. Super. 2017) (citation omitted).  We note, however, that:

> Discretion is limited … by 42 Pa.C.S.[] § 9721(b), which provides that a sentencing court must formulate a sentence individualized to that particular case and that particular defendant.  Section 9721(b) provides: "[t]he court shall follow the general principle

that the sentence imposed should call for confinement that is consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant…." 42 Pa.C.S.[] § 9721(b).

**Commonwealth v. Boyer**, 856 A.2d 149, 153 (Pa. Super. 2004).

Judge Coyle soundly and rationally articulated the reasons for why she imposed the sentence that she did, and why she found such a sentence necessary in order to protect the public. **See** TCO at 29-32. We also point out that she reviewed Appellant's presentence investigative report prior to sentencing him, **see id.** at 29, and observe that, "where the sentencing judge had the benefit of a presentence investigation report, it will be presumed that he or she was aware of the relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors." **Boyer**, 856 A.2d at 154 (citation omitted). **See also** TCO at 30 (Judge Coyle's stating that she "considered the mitigating arguments made by defense counsel, which included references to Appellant's family ties"). Accordingly, even if Appellant had properly preserved his sentencing claims, we would discern no abuse of discretion by the trial court in sentencing him.[3]

Judgment of sentence affirmed.

---

[3] Appellant set forth another issue in his Rule 1925(b) statement that he does not raise in his brief. We express no opinion on the trial court's discussion of the merits of that abandoned claim.

- 7 -

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/11/21

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CRIMINAL TRIAL DIVISION

**FILED**

MAY 13 2020

Appeals/Post Trial
Office of Judicial Records

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | ) | PHILADELPHIA COUNTY |
| | ) | COURT OF COMMON PLEAS |
| | ) | |
| VS. | ) | CP-51-CR-0011526-2016 |
| | ) | |
| | ) | |
| STEVEN ROSSER | ) | SUPERIOR COURT |
| | ) | NO.: 2874 EDA 2019 |
| | ) | |

## OPINION

Steven Rosser, the above-named Defendant/Appellant, seeks review of the Judgments and Order of Sentence entered on May 31, 2019, following a jury trial, before the Honorable Anne Marie Coyle, Judge of the Court of Common Pleas for the First Judicial District Criminal Division, hereinafter referred to as "this Court." Within his counselled Statement of Matters Complained of on Appeal, filed pursuant to Pa.R.A.P. §1925(b), Appellant claimed insufficiency of evidence, manifestly excessive sentences, and unconstitutionality of imposed "SORNA"[1] requirements. A full and fair review of the record demonstrated that: the convictions for all offenses had been soundly weighted by competent evidence; the respective Orders of Sentence had been executed well within authorized discretion; and the imposition of the corresponding Tier III "SORNA" Sex Offender lifetime registration requirements was proper having met constitutional standards.

---

[1] "SORNA" - Sexual Offender Registration and Notification Act, 42 PA.C.S. §§ 9799.10-9799.75. Since the offenses had been committed after December 20, 2012 Subchapter H. 42 PA.C.S., § 9799.0-42 applied. Thus, Tier III-Lifetime Registration with possible petition for removal from registry after 25 years was employed.

-1-

## PROCEDURAL HISTORY

Appellant Steven Rosser, was arrested in Philadelphia County following investigation and resulting execution of an authorized warrant on November 2, 2016. He was charged and arraigned with numerous offenses related to allegations that he had been repeatedly sexually assaulting the then seven (7) year old daughter of his girlfriend within the previous two-year period. A prima facie case was established at a preliminary hearing, and corresponding bills of information had been prepared. The instant case then traversed through numerous defense-delayed pre-trial conferences and trial listings within the Court of Common Pleas for the First Judicial District of Pennsylvania. After well over two years from date of arrest, on March 18, 2019, this matter was transferred for jury trial to be conducted in Courtroom 1002, with this Court as the presiding jurist. Jury selection began and was completed on that same day.

The Commonwealth of Pennsylvania was represented at trial by the District Attorney of Philadelphia Larry Krasner, by and through his then Assistant District Attorney Taylor Lake. Ben Cooper, Esquire had been appointed to represent Appellant during the pre-trial, trial, sentencing and initial direct appeal phases. Trial testimony began after opening statements of both counsel and preliminary instructions were provided to the jury. The prosecution concluded its case in chief on March 20, 2019 followed by the defense introduction of character testimony. Appellant did not testify. Closing arguments and final instructions were completed on March 21, 2019. The jury returned verdicts of guilt the morning of March 21, 2019, after deliberating approximately three hours on March 25, 2019 and one hour on March 21, 2019 and after seeking additional guidance in the form of questions that had been answered by this Court.

The jury returned guilty verdicts to the offenses of: Count 1: Rape of Child, 18 § 3121 §§ C, graded as a Felony of the First Degree; Count 2: Involuntary Deviate Sexual Intercourse With Child, 18 § 3123 §§ B, graded as a Felony of the First Degree; Count 3: Unlawful Contact With Minor, 18 § 6318 §§ A1, graded as a Felony of the First Degree; and Count 5: and Endangering Welfare of Children-Parent/Guardian, 18 § 4304 §§ A1 graded as a Felony of the Third Degree. Upon the recording of guilty verdicts, this Court revoked Appellant's bail and directed the completion of Presentence Evaluations and Mental Health Assessments by the First Judicial District Probation and Parole Department and scheduled the sentencing hearing in due course for May 31, 2019. This Court also directed that a Sexual Violent Predator Assessment pursuant to "SORNA"[2] be completed prior to the scheduled sentencing hearing.

On the sentencing hearing date of May 31, 2019, the Commonwealth's representative identified its choice not to pursue the "SORNA Sexual Violent Predator" assessment or corresponding designation. All parties by and though their counsel agreed that Appellant was to be designated as "SORNA Tier III Sex Offender," which requires lifetime registration. Following a full sentencing hearing, and after thorough review of all completed presentence reports and of all relevant sentencing data including, recommended guideline calculations, victim impact and defense character information and testimony submitted, the following Orders of Sentence were imposed:

Count 1: Rape of a Child, 18 § 3121 §§ C, F1: Minimum twenty (20) years to maximum forty (40) years of state supervised term of confinement;

---

[2] "SORNA" = Sexual Offender Registration and Notification Act, 42 Pa.C.S. §§9799.10-9799.75, Acts 10 & 29, effective February 21, 2018 and re-enacted June 12, 2018. In the instant matter, Sections: Subchapter H. 42 PA.C.S. §§9799..42 applied because the offenses had been committed after December 20, 2012; Thus, Sexual Violent Predator Designation and Tier III-Lifetime Registration with possible petition for removal from registry after 25 years could have been employed.

Count 2: Involuntary Deviate Sexual Intercourse with a Child, 18 § 3123 §§ B, F1: Minimum twenty (20) years to maximum forty (40) years of state supervised term of confinement running consecutively to Count 1;

Count 3: Unlawful Contact with Minor, 18 § 6318 §§ A1, F1: Minimum ten (10) years to maximum twenty (20) years of state supervised term of confinement running concurrently to Count 1;

Count 5: Endangering Welfare of Children, 18 § 4304 §§ A1, F3: Minimum three and a half (3.5) years to maximum seven (7) years of state supervised term of confinement running consecutively to Count 2;

Since three of the four imposed sentences for each of the separately convicted felony graded offenses were run consecutively to each other, the aggregate period of confinement was computed to be a minimum of forty-three and one half (43½) years to a maximum period of eighty-seven (87) years of state supervised confinement. Credit was provided for custodial time served. Rehabilitative conditions were imposed.

Appellant was ordered to mandatorily register over the remainder of his life-time as a SORNA Tier III Sex Offender with the state police and to comply with all Tier III Megan's Law or SORNA requirements, including DNA, fingerprinting, palm printing, and photo submission. Appellant was also directed to have no unsupervised contact with minors under any circumstances and have absolutely no contact with the victim. Additionally, Appellant was ordered to avail himself of vocational training, educational training, and sex offender treatment.

Following imposition of the respective Orders of Sentence, counselled *Defendant's Post-Sentence Motion* was apparently filed by Appellant's trial counsel summarily alleging that the "verdict was entered against the weight and sufficiency of evidence" and that the resulting Orders of Sentence had been excessive. Notably, this Court had not been accorded copies or notice of that counselled post-verdict motion and subsequently sought assistance of the First Judicial District Court of Common Pleas personnel to locate a copy of the motion when this Court had received a

-4-

copy of Appellant's *pro se* Notice of Appeal. The post-sentence motions had been deemed denied by operation of law.

A Notice of Appeal was filed by Appellant *pro se* on October 24, 2019. Despite preceding entered Orders of Court directing defense counsel to file docketing statements and a *Statement of Matters Complained of on Appeal Pursuant to Pennsylvania Rule of Appellate Procedure 1925(b)* nothing had been submitted by Appellant's counsel, Benjamin Cooper, Esquire. Per this Court's communicated request, a *Per Curiam Order* was entered by the Pennsylvania Superior Court filed December 31, 2019 granting this Court the ability to appoint new appellate counsel on behalf of Appellant.

After appointment of Daniel Alvarez, Esquire as appellate defense counsel, and pursuant to issuance of this Court's renewed Order entered February 24, 2020, a *Statement of Matters Complained of on Appeal Pursuant to Pennsylvania Rule of Appellate Procedure 1925(b)* was filed on March 6, 2020 which raised the following verbatim appellate claims:

1) The guilty verdicts for rape of a child, IDSI of a child, and unlawful contact with minor—sexual offenses, were against the weight of the evidence for the following reasons:
   a. there was no corroborating evidence or signs of physical trauma found by either law enforcement or by medical personnel;
   b. there was no eyewitness testimony of any sexual assault, to include Appellant's mother who for a period of 8 months in 2014, lived with Appellant, the victim, victim's mother and sibling;
   c. the victim disliked the Appellant as he would "whip" the victim, and Appellant proffers that this was motive to fabricate;
   d. Appellant presented several character witnesses who stated that Appellant enjoyed a good reputation in the community for peacefulness and nonviolence.
2) The evidence was insufficient to sustain the guilty verdict for rape of a child as there was insufficient evidence of penetration.

3) The sentence was excessive and the Court abused its discretion when it imposed a consecutive sentence that was much more than needed to protect the public and did not truly take into consideration many mitigating factors, such as Appellant's tremendous community and family support.

4) Appellant asserts that the sentence was illegal, as PA SORNA is unconstitutional, violates due process and is punitive, and violates the Ex Post Facto Clause.

The instant opinion shall address all defense claims as raised within *Defendant's Post-Sentence Motion* and *Statement of Matters Complained of on Appeal Pursuant to Pennsylvania Rule of Appellate Procedure 1925(b)*.

## FACTUAL HISTORY

Appellant's underlying arrest on November 1, 2016, stemmed from reports provided to law enforcement and to medical personnel at the Children's Hospital of Philadelphia ("CHOP") that then seven (7) year old child "A.J." had been repeatedly sexually assaulted since she was about five (5) years old by her mother's former boyfriend, later identified as Appellant, Steven Rosser. Steven Rosser was also the reported biological father of two of mother's younger minor children and had admittedly acted at times as "a caretaking step-father" of the victim predominantly during the 2014 period of reported abusive conduct.

The victim A.J. had informed responding professionals that during the preceding two-year period prior to abuse disclosure, the multiple attacks had largely taken place inside two respective apartments that had been rented by the victim's mother and occupied or visited at times by Appellant in South Philadelphia and North Philadelphia. The victim had also specifically detailed that the assaults had usually occurred when Appellant, who had no legitimate form of employment,

had been supervising the victim and her siblings while A.J.'s mother was working various shifts at Wendy's Restaurant.

A.J. disclosed to investigators and medical personnel that the abuse had begun when Appellant had forced her to put her hands down Appellant's pants and to rub his penis with her hands until his penis hardened. She also revealed that Appellant had also forced her to perform oral sex upon Appellant's penis. She disclosed that Appellant, whom she knew as "Steve" or "Big Steve," had at different times forced his penis inside her mouth and demanded that she suck his penis until "white" stuff" appeared which often had to be wiped off her mouth with a dirty rag. She had also reported that on other occasions, Appellant had laid her down on her mother's bed and other surfaces and forced his penis inside her vagina which hurt her. A.J. recalled that she had been very fearful of Appellant because he had often threatened her if she told anyone, ignored her pleas to stop, and had frequently beaten or "whooped" her.

The victim's mother "I.B." claimed to law enforcement investigator Detective Kim Boston of the Philadelphia Police Department Child Abuse Unit that she had become aware of the abuse of her daughter A.J. when a neighbor told her that A.J. had been performing oral sex upon request of another boy of her same tender age during outside play in the neighborhood. When she had asked her daughter A.J. who had taught her to do that, her daughter identified "Big Steve" as her sexual instructor. After A.J. disclosed the abuse, her mother told someone at her children's day care what A.J. had stated. When that daycare person realized that A.J.'s mom had not reported the abuse to authorities, that person called the hotline of the City of Philadelphia's Department of Human Service ("D.H.S.").

Christopher Li testified at trial that he was the initially assigned D.H.S. social worker who had been dispatched to interview A.J. at her school upon review of the initial protective service

-7-

report on September 29, 2016. (See Notes of Testimony 03/19/2019 pages 115-117.) Mr. Li recalled that he had met A. J. in the school counselor's office with an intern and noted that "she was displaying age-appropriate behavior. She was calm. She was a friendly child. She was very articulate with what she was speaking to me about." (Id. at p. 117)

Based upon what A.J. had revealed to him, Mr. Li discussed the report with his supervisor and outreached to the victim's mother. He determined that the "...child was at risk at this time, the allegations and she (victim's mom) allowed continued contact." (Id. at p. 117) The alleged perpetrator, Steven Rosser, was also the reported biological father of those two younger siblings L.R. a female then aged five (5) years and S.R. then aged two (2) years. Due to concern of possible abuse of one of the younger siblings that the victim's mom had sent to Steven Rosser's residence, those children were deemed to be also in imminent risk and removed upon location of Mr. Rosser's residence pursuant to entry of commensurate Emergency Protective Orders and placed in foster care. (Id. at pgs. 117-118) The victim A.J. was placed under supervision with her biological father.

At trial, the medical data had been introduced via stipulation reflective of the intrusive physical examination conducted of the victim "A.J." recorded by personnel at Children's Hospital of Philadelphia ("CHOP") and the associated Safer Place Child Protection Team Program marked and introduced as Commonwealth Exhibit #5. Dr. Kristine Fortin as a CHOP pediatrician who had specialized in the field of child abuse pediatrics provided the jury a capsuled history of her impressive qualifications and experience. (N.T. 03/19/2019 pgs. 123-128)

Without defense objection, Dr. Fortin testified as an expert in the field of pediatric medicine and specifically both sexual and physical pediatrics. She testified that she had been actively working as a pediatrician specializing in child abuse and as part of the CHOP Safer Place for Child Protection Team when she met A.J. (Id. at pgs. 123-128) Dr. Fortin provided detailed

analysis of the data contained within the medical reports marked and introduced into evidence as Commonwealth Exhibit #5 which included the physical and genital examination that she had personally conducted of A.J. (Id. at pgs. 128-145)

After providing clear and cogent reasons for her diagnosis and expert opinions, Dr. Fortin had diagnosed and expertly opined that the reflection of normal physical examination or lack of observed trauma to the genital areas did not detract from A.J.'s report of sexual abuse with penetration. (Id at pgs. 141-145) She explained that particularly given the natural elasticity of the body parts involved and the length of time following the child's disclosure, that normal findings were not unusual. Dr. Fortin had further opined that her review of extensive research studies coupled with her practical experience consistently demonstrated that trauma of the genital areas had only been detected in less than five percent of child victims who had credibly disclosed sexual abuse in this nation. (Id. at 141-145)

On the same day, just before the physical examination was conducted, A.J. had been forensically interviewed by Philadelphia Children Alliance forensic examiner or specialist Colleen Getz. As agreed, that recorded forensic interview had been video-taped and introduced into evidence as Commonwealth Exhibit #3 and displayed in full to the fact-finding jury at trial within the testimony of interviewer from the Philadelphia Children's Alliance Forensic Specialist Colleen Getz. Ms. Getz's forensic notes and corresponding report was also marked and introduced into evidence as Commonwealth Exhibit #2. (N.T. 03/20/2019 pgs. 12-34)

Specialist Colleen Getz testified at trial, that on October 3, 2016 she had interviewed A.J. in a separate, child friendly room environment at the Philadelphia Children's Alliance ("PCA") location in Philadelphia. After providing a summary of her extensive training, she explained that during each forensic interview the child being interviewed is made to feel as comfortable as

-9-

possible and permitted to simply provide the memories that he or she had wished to discuss without any pressure. Ms. Getz described the setting as inclusive of a one-way mirror behind which other persons such as the assigned investigator could unobtrusively observe the interview. She stated that the questions posed as part of the investigative process were unbiased, not leading and nonsuggestive. Specialist Getz educated the jury as to how time perception differs with children than adults and how it is normal for children of the victim's age to recount her experiences gradually. (Id. at pgs. 25-29)

Ms. Getz related that the first part of the forensic interview was geared to achieve a rapport with A.J. and to assess her mental competency to proceed. (N.T. 03/20/2019 pgs. 20-27) Once she had established A.J.'s competency, Ms. Getz focused the interview upon the allegations at issue. She reiterated that every question was asked "open-ended." Ms. Getz testified that as a practice:

> ..."(W)e'll ask them why they came to talk with us or what they know about talking with us today and then kind of move down that funnel into more detail-specific questions as needed but we always want to open the questions back up so that the children are the ones presenting us with the information and the information is not coming from the interviewer. Toward the end of the interview, we'll take a break and the interviewer will go next door to check in with the investigative team and see if they have questions that we haven't asked already or if they need clarity on something that the child has said during the interview..."

(Id. at pgs. 27-28)

Ms. Getz had recorded her physical impressions of A.J.'s demeanor and had insured that her interview had been preserved on video in its totality. Those records also included the introduced drawing that A.J. had done during the interview. Those recorded impressions combined with the video-taped interview demonstrated the consistency and graphic sensory details of the abuse disclosures provided by this child victim as well as her emoted physical reactions. (Id. at pgs. 28- 34)

-10-

The recorded forensic interview admitted in full as evidence as agreed demonstrated that this child victim had reliably described the predatory methods of sexual abuse that she had suffered. During this interview, A.J. had competently and credibly recounted multiple traumatizing memories of Appellant's repeated sexual assaults that included forced penile penetration into her mouth and vagina. She had concretely informed the interviewer that she had been forced to perform oral sex on Appellant's penis with her mouth and hands more than once.

At the age of ten years, A.J. bravely testified at trial over three years after she had disclosed to her mom and others about Appellant's repetitive abuse. After responding to competency and general background questions, she described the involved familial relationships. (N.T. 03/19/2019, pgs. 8-12) She said that she had initially met Appellant, whom she had described as "Big Steve" or "Steve" when she was about four years old and that at times he had lived with her and her mother and two of her younger siblings. She understood that Appellant was the father of her younger sister L.R. and baby brother S.R. and identified Appellant fearfully in the courtroom. (Id.)

As she sat facing her perpetrator and the stranger-filled courtroom including the fact-finding jury, A.J. quietly and unreservedly responded to questions about some of her most painful memories. She testified credibly and convincingly about the myriad of methods that Appellant had employed to sexually and physically attack her. She recalled that Appellant began touching her private parts when she was in kindergarten, particularly when she, her siblings and her mom were living in apartments in north and south Philadelphia. (Id. at pgs. 13-72)

A.J. testified that one of her early recollections was when she was about five years old and her youngest brother "S.R." was still "in her mom's stomach." She said that Appellant had been watching her and her younger sister "L.R." while her mother "I.B." was working at Wendy's. (N.Y. 03/19/2019 pgs. 11-16) She said that before her mom came home from work, Appellant

-11-

came into the bedroom where she and her sister slept. He told her to go into the bedroom that he had slept in with her mom. When she entered that bedroom, he was laying on the bed. (Id. at pgs. 14-24)

She testified that on that occasion "(H)e told me to come here and then he just pulled his pants down." (Id. at 16) She thought that she had asked him why he had his pants down. She was unsure of his verbal response but distinctly recalled "He just pushed my head down." (Id. at p.17) She further stated that after he pushed her head down to his private part, which she identified as his penis, was inside her mouth touching her tongue. She said that he kept moving her body by putting his hand on the back of her head and moving her head "front to back." She said it felt "weird" and that it hurt her throat. (Id. at pgs. 17-20) She also recalled his instruction to "her not to bite it." (Id at p. 20) She stated that he stopped because her mom had called him on the phone to say she was on her way home from work. A.J. also remembered that at times "white stuff was dripping from his private part" and that it happened more than once. (Id. at pgs. 20-21)

A.J. spoke of other times when Appellant had forced her to perform oral sex on his penis. She distinctly recalled tasting the "stuff that came from his private part." She recalled his grabbing of a dirty rag to wipe her mouth during one of those times. (Id. at pgs. 24-26) A.J. then related concrete details of one of the attacks during which Appellant had removed her pajamas and took off his clothes and laid her on the bed and "put his private part into her private part." (Id. at p. 28) She described that her private part is the front part when used for peeing and that it hurt her. She described his private part as his penis.

A.J. testified that she had told Appellant to stop but that he would not listen to her. She said that this had also happened on other days. (Id. at pgs. 28-32) When asked about whether Appellant had hurt her in other ways, she said that Steve would use his fingers to rub her private parts over

-12-

and under her clothes particularly before or after he had "whooped" her. She also reported being forced to manually rub his penis until he became hard. (Id. at pgs. 32-37)

A.J. spoke of being terrified to reveal Steve's abuse because he had constantly threatened her and frequently physically beat or "whopped her" to force her into quiet submission to his sadistic demands. (Id. at pgs. 39-40) She recalled telling her mom earlier that Steve had touched her private parts one time when her mom had observed a rash in second grade. (Id. at p. 40)

As to the precipitating disclosure event, A.J. had remembered that there was a time in the backyard when "A boy was trying to do the same thing...as Steve." (Id. at pgs. 40-41) She said that when her mom asked her who had taught her how to do that, she told her "big Steve" and her mom started crying. (Id. at pgs. 40-41) When asked A.J. about her subsequent forensic interview, she recalled talking to a lady named Colleen and that she had been very nervous with her and also nervous talking to the jury "because everyone is looking at me." (Id. at p. 43)

During cross-examination, A.J. was asked about the defense's perception of inconsistencies of details reported regarding within preceding accounts that she had provided two years earlier. (Id.at pgs. 44-73) Even though many of the defense questions as posed were confusing, even to adults, A.J. responded unequivocally to each inquiry. Her testimony remained unshaken. Summarily, those referenced inconsistencies reflected only minor, natural differences in memory and illuminated the fact that there had been frequent sexual attacks committed over time. (Id.)

A.J.'s mother "I.B", testified that she had met Appellant when she was nineteen years old and that he was the biological father of the middle two of her four children. (N.T. 03/19/2019 p.76) She said that her relationship progressed from friends to moving in with her on and off in the summer of 2010. (Id. at p. 77) She further testified that sometime in 2014 she had been working

-13-

12-14 hour varied day and night shifts as a shift manager at Wendy's. (Id.) She claimed that her relationship with Appellant ended sometime in 2015 but that the children continued to see Appellant after the separation. (Id. at p.80)

I.B stated that sometime during that period in 2014 she had moved from a one-bedroom apartment in South Philadelphia to a two-bedroom apartment in North Philadelphia. I.B. stated that she had viewed Appellant's relationship with A. J. as like a "father and daughter." (Id. at p. 78) She said that Steve would watch all her children sometimes when she worked and that he had supported her by assuming "other physical responsibilities that she could not handle" like picking them up for school, taking them to doctor's and dentist's appointments. (Id. 78)

When asked about A.J.'s disclosure to her, I.B. testified:

"So one day we was walking outside and other little boys was like, 'A. that's why you were sucking dick in the backyard.' So I took her in the house, took her upstairs in the room, me and her alone, and asked her did she do that and she said 'yes.' And I said, 'Why? Did someone else do that to you before? She said, 'Yes.' I said, Who? She said 'Steve.'..."

(Id. at pgs. 80-81)

I.B. stated that she and A.J. were both emotional and crying and that during that conversation she had stopped A.J. from telling any other details after A.J. told her that more than once "He put his private, his penis in my mouth." (Id. at pgs. 80-81) I.B. said that she called Appellant who denied that he had done anything. I.B. questioned her daughter daily after the initial disclosure and A.J. never wavered.

I.B. described being overwhelmed by difficult life circumstances after A.J. told her what had been happening to account for her lack of reporting of A.J.'s abuse to authorities and for her placement of her two younger children in Appellant's care despite what A.J. had disclosed to her. I.B. stated that after her eviction, which had occurred two days after the disclosure, she had sent

-14-

A.J. to her biological father Amir and her two younger children to their biological father, Appellant, because she had no home. She said that she had slept in her car the first night after the eviction and then stayed at her relative's home after sending three of her children to their respective father's homes. (Id. at pgs. 81-84)

During the trial, I.B. projected resentment of the DHS and law enforcement's efforts to protect her young children. Her testimony completely confirmed however A.J.'s accounts of how and when the final disclosure had occurred and the prevailing relationships that had been in play. Mom reported that she had felt guilty that she had been unaware that Appellant had been hurting her daughter. She had left him alone with the children as caretaker when she was working varied shits at Wendy's. Appellant had been unemployed and therefore available particularly in 2014 which was the predominate period of reported abuse. (Id. at pgs. 81-86)

The corroborating trial testimony of the victim, her mother, DHS personnel and the original forensic interviewers and authenticated stipulated records and copies of previously provided written interviews revealed that after approximately two years of brazenly exploiting this child as a sexual plaything, Appellant's deeds had been finally exposed. Upon completion of the prosecution's case in chief, the defense presented character testimony particularly from Appellant's mother and friends, each of whom demonstrated bias in favor of Appellant. Notably, a few of these character witnesses knew Appellant by a different last name. Appellant chose not to testify and the defense rested. No rebuttal was presented.

DISCUSSION

The *Defendant's Post-Sentence Motion* and *Statement of Matters Complained of on Appeal* essentially recited broad claims of sufficiency and weight of trial evidence. Within both filings, Appellant generally complained about the length of the imposed periods of confinement and

-15-

legality of the respective Orders of Sentence. The constitutionality of the imposed SORNA requirements was also challenged.

Summarily, as set forth more fully below, all of Appellant's arguments fail because: ample evidence had supported each conviction; and that the respective Orders of Sentence addressing each offense for which Appellant had been duly convicted were justifiably imposed particularly given the extreme harm that Appellant had knowingly and systematically inflicted upon this vulnerable and defenseless young child during her formative years. Moreover, the requirements imposed as a Tier III Sex Offender pursuant to SORNA did not violate any due process rights.

## I.    Sufficient evidence existed to support all convictions.

Appellant broadly contended in post-sentence motion and as an appellate claim that the recorded jury verdicts of guilt particularly as it related to the sexually based offenses had not been sufficiently supported by evidence. To support these claims recited within the Statement of Matters Complained of on Appeal, Appellant specified: observable physical trauma to A.J. and additional eyewitnesses to the reported abuse had been lacking; and the defense had introduced countervailing character testimony and motivation of the victim to fabricate the allegations.

Each of these supportive rationales miscarried because they had ignored the value of the recorded cumulative convincing evidence presented to the fact-finding jury. Mainly, the claims unduly discounted the testimony of Dr. Karen Fortin, who had provided clear and cogent explanations for her expert opinions and findings that a lack of observed physical trauma to A.J., given the circumstances, had not meant that the assaults had not occurred. She educated the jury to the unassailable fact that the physical examination of A.J. had been conducted quite some time after the alleged abuse had ceased and that the involved body parts had possessed a natural elasticity with quick recovery abilities. She further expertly opined that ninety-five percent of

-16-

validly reported sexual assaults in children do not have corresponding noticeable trauma to their genital body parts.

Further, reliance upon the need for additional eyewitnesses to prove sexual assaults of any child defied reality and existing law because by their very nature these types of crimes had been purposefully conducted in secret. This is the reason that our appellate courts have upheld provision of the same standard jury instruction that had been imparted in this case as follows:

> "...Now, in this case you need to understand that he testimony of A.J. standing alone if believed by you, is sufficient proof upon which the defendant-you may find the defendant guilty in this case.
> If believe by you beyond a reasonable doubt, the testimony of a victim in a case such as this need not be supported by other evidence to sustain the conviction. Thus, you may find the defendant guilty if the testimony convinces you beyond a reasonable doubt that this defendant is guilty..."

(N.T. 03/21/2019 pgs. 20-21) *See also* Chapter 31. Section 3106 of the Crimes Code which specifically states in part: "The testimony of a complainant need not be corroborated in prosecutions under this chapter." (Act of May 18, 1976, P.L. 120, No. 53, as amended March 31, 1995, P.L. 985, No. 10, § 3106.)

Finally, the rationale that introduction of character testimony in this case had required nullification of the resulting convictions reflected complete obliviousness of the authorized role and function of the fact-finding jury who had assessed compelling evidence of guilt. Moreover, this jury had been properly instructed as follows:

> "...I cannot stress to you enough that I am not the judge of the facts, you are. It is your responsibility to weigh this evidence and from that evidence and the logical inferences that flow from that evidence to find the facts in this matter.
> You will apply the rules of law that I give to you to the facts as you find them to decide whether or not this defendant has or has not been proven guilty beyond a reasonable doubt.
> In determining the facts, you are to consider only the evidence presented in this court and the logical inferences that flow from that evidence. You are not to rely upon supposition or guess about anything not in evidence that you find to be incredible even if uncontradicted."

(N.T. 03/21/2019 pgs. 11-12)

This Court also provided the jury with the following recommended standardized guidance concerning the value of the introduced character testimony:

> "The law recognizes a person of good character is not likely to commit a crime that is contrary to the person's nature. Evidence of good character may, by itself, raise a reasonable doubt of guilt and require a verdict of not guilty. You must weigh and consider the evidence of good character along with the other evidence in this case. If upon all the evidence you have a reasonable doubt of the defendant's guilt, you must find him not guilty. However, if on all the evidence you are satisfied beyond a reasonable doubt is guilty, you must find him guilty."

(N.T. 03/21/2019 pgs. 28-29) After following the directions provided by this Court, the jury properly measured all introduced evidence and determined that the introduced testimony of Appellant's reputation for being a person of "good character" had not been persuasive or credible. Therefore, all specific assertions identified within the *Statement of Matters Complained of on Appeal* to support the broadly stated insufficiency claim and the incorporated weight of evidence argument as vaguely stated within the *Defendant's Post-Sentence Motion* failed for lack of factual and legal merit.

In reviewing the sufficiency of evidence claims, an appellate court considers "whether the evidence presented at trial was sufficient to establish all elements of the crime beyond a reasonable doubt." *Commonwealth v. Burton*, 2 A.3d 598 (Pa. Super. 2010). The appellate court views all the evidence and reasonable inferences therefrom in a light most favorable to the Commonwealth as verdict winner. *Id.* Where there is sufficient evidence to enable the trier of fact to find every element of the crime has been established beyond a reasonable doubt, the sufficiency of the evidence claim must fail. *Id.* The evidence established at trial need not preclude every possibility of innocence and the fact-finder is free to believe all, part, or none of the evidence presented." *Commonwealth v. Feliciano*, 2013 PA Super 117, 67 A.3d 19 *quoting Commonwealth v. Stokes*,

-18-

2011 PA Super 261, 38 A.3d 846, 853-854 (Pa. Super. 2011) (internal citations and quotations omitted).

As to the conviction of Appellant for Rape of a Child pursuant to 18 Pa.C.S.A. § 3121(c) graded as a first-degree felony, the statutory elements are straightforward. A person is guilty of the crime of Rape of a Child if the evidence proves beyond a reasonable doubt that the adult person engaged in sexual intercourse with a minor person of the same or opposite sex who was less than thirteen (13) years old. 18 Pa.C.S.A. § 3121(c).

The term "sexual intercourse" includes not only vaginal sex, but also "intercourse *per os or per anus*, with some penetration however slight; additionally, "emission is not required."18 Pa. Cons. Stat. Ann. § 3101. The term "sexual intercourse" also includes penetration, however slight, of the genitals or anus of another person with a foreign object for any purpose other than good faith medical, hygienic or law enforcement procedures." 18 Pa.C.S.A. § 3101; see also *Commonwealth v. Kelley*, 569 Pa. 179, 801 A.2d 551, 555 (Pa. 2002), citing *Commonwealth v. Lee*, 432 Pa. Super. 414, 638 A.2d 1006 (Pa. Super. 1994), appeal denied, 538 Pa. 643, 647 A.2d 898 (Pa. 1994) (interpreting sexual intercourse and deviate sexual intercourse to include acts of oral and anal sex).

In this case, those statutory elements of the first-degree felony graded offense of Rape of a Child mirrored within the final instructions to the fact-finding jury. (N.T. 03/21/2019 pgs. 31-32) Those elements had been sufficiently supported by the victim's convincing trial testimony of having been repeatedly penetrated vaginally with Appellant's penis and fingers beginning when she was in kindergarten and continuing through her first grade during when she was approximately five (5) and six (6) years of age. (N.T. 03/19/2019 8-42)

A.J. at age ten years, persuasively testified that Appellant, her stepfather "Big Steve," began with inappropriate touching but then quickly escalated to forcing her to open her mouth and "suck" his inserted penis. (Id.). She recalled vivid memories of pleading with him to stop, but that he would continue the abuse relentlessly and provided life experiences as time references. (Id. at 41). A.J. also credibly recounted being threatened with harm and having suffered repeated physical beatings or "whooping" if she told anyone what had been happening. (Id. at 39)

In addition to proof beyond a reasonable doubt of Rape of a Child being presented by the victim's credible trial testimony, this jury had the additional benefit of viewing the entire forensic interview of A.J. conducted by the specialist from Child Alliance Forensic conducted far closer in time to the abusive conduct. Within this forensic interview, A.J. without responding to biased or leading questions, had reliably recounted additional raw and explicit details of Appellant's varied methods of offense element qualifying sexual attacks. Frankly, overwhelming proof had been presented to justify Appellant's conviction for the offense of Rape of a Child.

Appellant similarly averred that there had been insufficient evidence to convict him of the first-degree felony graded offense of Involuntary Deviate Sexual Intercourse of a Child. As to this defined crime, this Court had properly provided the standard instruction which emulated the statutory elements cited under 18 Pa.C.S.A. § 3123(b) as follows:

> (b) Involuntary deviate sexual intercourse with a child. —A person commits involuntary deviate sexual intercourse with a child, a felony of the first degree, when the person engages in deviate sexual intercourse with a complainant who is less than 13 years of age.

As this Court further explained to the jury, penetration as defined in both versions of the offense was required to be proven, "however slight, of the genitals or anus of another person with a foreign object for any purpose other than good faith medical, hygienic or law enforcement procedures." 18 Pa.C.S.A. § 3101; see also *Commonwealth v. Kelley*, 569 Pa. 179, 801 A.2d 551,

555 (Pa. 2002), citing *Commonwealth v. Lee*, 432 Pa. Super. 414, 638 A.2d 1006 (Pa.Super. 1994), appeal denied, 538 Pa. 643, 647 A.2d 898 (Pa. 1994) (interpreting sexual intercourse and deviate sexual intercourse to include acts of oral and anal sex). (See N.T. 04/05/2018 pages 78-83).

As this Court had properly instructed the jury:

"Involuntary deviate sexual intercourse with a child. A person commits involuntary deviate sexual intercourse with a child when the person engages in deviate sexual intercourse with a child who is less than 13 years of age. Under our rimes code, such an offense can be committed by either a male or female upon the child of the same or opposite sex.

Deviate sexual intercourse has a special meaning in criminal law. By deviate, I do not mean a valued judgement in either way. Deviate, as it is sometimes pronounced, is a legal term that should not be confused with deviant, which often has that negative connotation

Deviate sexual intercourse occurs if a man's penis penetrates the mouth or anus of a person or if a person's tongue penetrates a sexual organ of a woman. Deviate sexual intercourse also occurs of a person uses a physical object not part of his or her body to penetrate the anus of another person or the sexual organ of a woman for any purpose other than good faith, medical, hygienic or law enforcement purposes.

For all forms of deviate sexual intercourse, the slightest degree of penetration is sufficient and no emission of semen is required. It is immaterial whether he child consented to the contact. Consent of the child is no defense. It is also no defense if the defendant did not know the age of the child or the child lied about his or her age or the defendant honestly believed the child was 13 years or older or the defendant reasonably believed the child was 13 years or older."

(N.T. 03/21/2019, pgs. 32-34)

As the cumulative evidence introduced at trial unequivocally proved, Appellant, as an adult, had not only forcibly inserted his penis into her "private part" where she "pees," these compelled penetrations had caused her pain like a "stick" going into her body. (N.T. 03/19/2019, pgs.19, 30-31) The elemental requirement of "penetration however slight" had been met. Moreover, A.J. also reported to her mother, to law enforcement, to medical personnel, in detail to the forensic interviewer and to the jury, that Appellant had also routinely forced this young child

to perform acts of oral sex on his penis until "white stuff" had appeared on and in her mouth. (N.T. 03/19/2019, pgs. 12-26)

A.J.'s graphic recollections vividly supported her credibility. Particularly jolting was her raw comment that Appellant had told her "don't bite it" as he was pushing her head down on his penis. (Id. at p. 20) Similarly illuminating was A.J.'s recollection that Appellant had pushed his penis so hard into her mouth that it "hurted" her throat. (Id.) Other revealing details included within her testimony was the need to wipe off the dripping white stuff from her mouth with the rag to avoid detection from her returning working mom. (Id. at pgs. 21-23) The elements of the first-degree felony crime of Involuntary Deviate Sexual Intercourse with a Child pursuant to 18 Pa.C.S.A. § 3123(b) had been abundantly proven.

Appellant also complained that there had been insufficient evidence to convict him of the first-degree felony offenses of Unlawful Contact with a Minor pursuant to 18 Pa.C.S.A. §3125 §§ B, graded as a Felony of the First Degree. As to this charge, this Court had explained all offense elements to the jury consistently with the applicable statute and had also included the requested pointed questions to reflect the jury's decision regarding proof of the possible purposes of the "unlawful contact" as follows:

> "Unlawful contact with a minor. To find the defendant guilty of this offense, you must find the following three elements proven beyond a reasonable doubt. Number one, that the defendant was intentionally in contact with a minor. Second, that the contact was for the purpose of engaging in an unlawful act, that is rape of a child or involuntary deviate sexual intercourse of a child.
>
> If this element is proven beyond a reasonable doubt, you must indicate on the verdict form which act or acts you have fund to be so proven. Third, that either the defendant or the person being contacted was within this Commonwealth of Pennsylvania.
>
> Contact is any direct or indirect contact or communication by any means, method, or device including contact or communication in person. And finally, the minor at issue was an individual under the age of 18 years.

Now, under the charge of unlawful contact you must answer as I just said to you the following questions: Was the contact for the purpose of engaging in guilty rape of a child? Yes or no.

Was the contact for the purpose of engaging in involuntary deviate sexual intercourse of a child? Yes or no. Those responses will be recorded in this same manner as recording the verdicts."

(N.T. 03/21/2019, pgs. 34-35) The fact-finding jury recorded the unanimous affirmative responses to the questions as well as to the guilty verdict of this offense.

Supporting these elements, A.J. reported and testified that Appellant, as an adult, had repetitively forced her to suffer penile and mouth penetration of her genitals when she was, and remains well, under thirteen years of age. A.J. unswervingly stated that Appellant continued forced mouth and penis penetration of her vagina beginning the age of five and six years old. She demonstrated feeling utterly alone and trapped because she had been unable to stop Appellant from hurting her. She testified that she was made all the more fearful because Appellant had threatened and had frequently beaten her if she had disclosed the abuse. She had been conditioned to know that she had not been safe. Her vividly related memory to the jury of the bruises that Appellant had inflicted upon during his multiple "whoopings" of her had been most instructive. (Id. at pgs. 28-34)

Appellant alleged in his post-sentence motion that the evidence was insufficient to find him guilty of the third-degree felony graded offense of Endangering Welfare of Children-Parent/Guardian/Other Commits Offense pursuant to 18 Pa.C.S.A. § 4304 §§ A1. This offense is statutorily defined: "[a] parent, guardian, or other person supervising the welfare of a child under 18 years of age.... commits an offense if he knowingly endangers the welfare of the child by violating a duty of care, protection or support." 18 Pa.C.S.A. § 4304.

As this Court consistently informed the jury, conviction of Appellant for this offense this required proof beyond a reasonable doubt: 1) the accused was aware of his or her duty to protect

the child; 2) the accused was aware that the child was in circumstances that could threaten the child's physical or psychological welfare; and 3) the accused had either failed to act or has taken action so lame or meager that such actions cannot reasonably be expected to protect the child's welfare. See also *Commonwealth v. Pahel*, 456 Pa. Super. 159, 689 A.2d 963, 964 (Pa. Super. 1997), citing *Commonwealth v. Cardwell*, 357 Pa. Super. 38, 515 A.2d 311, 315 (Pa. Super. 1986).

In the instant matter, the Commonwealth of Pennsylvania had easily proven to the jury's fact-finding satisfaction that Appellant had abused his adult guardianship authority as supervising step-parent of this young child to facilitate his continuing criminal course of conduct that harmed her physically and mentally. His repetitive beatings of her alone which had left marks upon her body at least once had certainly endangered her physical and mental well-being. Clearly, Appellant had repeatedly violated his statutory attributed duty of care toward this tiny but tough-minded child. These acts also provided corroborating proof of his continuing course of criminal conduct.

Finally, the myriad forms of systematic sexual attacks that he had employed had robbed this victim of her childhood innocence. To summarize, the collective direct and circumstantial evidence introduced in this case strongly supported the guilt verdicts reflecting that Appellant had committed multiple incidents of Rape, Involuntary Deviate Sexual Intercourse, Unlawful Contact with a Minor and Endangering Welfare of A Child and by so doing intentionally and methodically endangered her physical and mental welfare while corrupting this child's morals as part of a continuing course of exploitive conduct.

These crimes predominantly began and repeatedly occurred while the complainant was between the ages of five (5) and seven (7) years old mostly in 2014 when he had unfettered access to her. A.J. testified that Appellant had repeatedly hurt her when he penetrated her vagina and her

-24-

mouth with his penis and fingers and demanded that she sexually gratify him with her mouth and hand movements until his penis had hardened and "white stuff" had appeared."

This very young victim provided her concrete references to times when Appellant had threatened her and ignored her pleas to have him stop which left her very fearful and alone and unable to inform anyone of the abuse. Sadly, this victim's mother had not been protective of A.J. and initially subjected her to continued harm even after disclosure until someone else reported to authorities both mother's failure to cease contact with Appellant as well as child's disclosure. Appellant had continually placed himself as guardian of A.J. and her younger siblings and abused that responsibility.

Contrary to the appellate claim as stated, no viable motivation for this clearly traumatized child to have fabricated anything had been presented. The notion that a child must have fabricated being abused because she had testified that she had disliked her perpetrator who had beaten and molested her is inherently ludicrous. Also, as to the circumstances related to final disclosure, A.J. had been very forthcoming as to what she had been doing consensually with the other boy who had been her age. She recalled that her mother's response was not of anger towards her. She had obviously learned well the difference between voluntary versus forced conduct.

In sum, the collective evidence introduced at trial provided to the jury as fact finders overwhelming corroboration of each credible, graphic and consistent account of abuse. Accordingly, no trial court error had been committed by denying the post-sentence motions based upon sufficiency of evidence.

## II.     Appellant was not entitled to a new trial based on the weight of the evidence.

Similar to the sufficiency of evidence claim, Appellant had vaguely disputed within the *Defendant's Post-Sentence Motion* that the trial court had committed an abuse of discretion by

-25-

denying his motion for a new trial on weight of the evidence grounds. Incorporating by reference this claim was the appellate assertion that evidence resulting from the introduction of "good character" testimony had outweighed the cumulative evidence of Appellant's guilt. However, this claim as all other recited claims had lacked factual and legal merit for the reasons as stated within this Court's analysis of the sufficiency of evidence claims and supplemented by the rationale recited below. Essentially, the collective weight of all trial evidence had soundly supported all of fact-finding jury verdicts of guilt.

The weight given to the evidence is wholly the province of the finder of fact "who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses." *Commonwealth v. Hunzer*, 868 A.2d 498, 506-507 (Pa. Super. 2005). Any motion for a new trial grounded in the contention that the "verdict is contrary to the weight of the evidence, concedes that there is sufficient evidence to sustain the verdict. Thus, the trial court is under no obligation to view the evidence in the light most favorable to the verdict winner." *Commonwealth v. Rossetti*, 863 A.2d 1185, 1191-1192 (Pa. Super. 2004), appeal denied, 583 Pa. 689, 878 A.2d 864 (2005).

The decision whether to grant a new trial on this basis rests within the discretion of the trial court. *Commonwealth v. Hunter*, 381 Pa. Super. 606, 617, 554 A.2d 550, 555 (1989). "A trial court should award a new trial on the ground that the verdict is against the weight of the evidence only when the . . . verdict is so contrary to the evidence as to shock one's sense of justice and [make] the award of a new trial [ ] imperative so that right may be given another opportunity to prevail." *Commonwealth v. Whitney*, 511 Pa. 232, 239, 512 A.2d 1152, 1155-1156 (1986).

A weight-of-the-evidence claim "concedes that sufficient evidence exists to sustain the verdict but *questions which evidence is to be believed.*" *Commonwealth v. Charlton*, 902 A.2d 554, 561 (Pa.Super. 2006) (quoting *Commonwealth v. Galindes*, 786 A.2d 1004, 1013 (Pa.Super.2001))

-26-

(emphasis added); such a claim only challenges how much weight should be "accorded . . . testimonial evidence." *Commonwealth v. Morgan*, 2006 PA Super 351, 913 A.2d 906, 909 (Pa. Super. Ct. 2006) (quoting *Armbruster v. Horowitz*, 744 A.2d 285, 286 (Pa. Super. 1999)).

The cumulative evidence that had been presented by the Commonwealth of Pennsylvania was credible, convincing and compelling. Nothing presented in this trial remotely suggested that the jury's guilty verdicts had been entered contrary to, nor is it against the weight of, the evidence. The conclusions and verdict reached by the finders of fact were logically based on common sense inferences sufficient to eviscerate any possible conclusion that the convictions had been based on surmise or conjecture. None of the verdicts shocked anyone sense of fairness or justice. To the contrary, the victim's testimony standing alone was trustworthy and unwavering. Moreover, the corroborating forms of testimonial evidence from the expert, the forensic interviewing specialist, and the victim's mother corroborated the victim's accounts.

Contrasting the sturdy evidence presented by the Commonwealth of Pennsylvania, the testimony introduced by the defense as to Appellant's "good character" did not dispel the fact-finders' assessment. Indeed, the defense character evidence validated the testimony of the victim and her mother that each had been lured to trust Appellant's positive projection of "good character." Appellant had exploited his reported positive status within the community to abuse this child. Moreover, each of the persons who had testified on Appellant's behalf including his mother, displayed bias in favor of Appellant. Interestingly, some knew him by another last name entirely.

Therefore, no trial court had been committed because none of the jury's verdicts had been properly entered against the super strength of the trial evidence. Since no error had been committed no remedy was warranted.

III.    The Order of Sentence constituted reasonable exercises of sentencing discretion.

-27-

Appellant recited related appellate claims within the statement of alleged errors and post-sentence motion concerning this Court's imposition of the Judgments and Order of Sentence. Essentially, Appellant claimed that the imposed individual and aggregate sentences had been manifestly excessive principally because the sentences for three of the four felony graded offenses had been imposed to run consecutively. Incorporated within this claim was the previously raised assertions at time of sentencing, that Appellant's stated age of twenty-eight years, the stated support of his family and friends, his character reputation and the distant age of his two prior adjudications for felony drug offenses should have accorded Appellant shorter terms of confinement. The respective sentences for each felony offense for which Appellant had been convicted however had been justly imposed and well-deserved given the repetitive acts of intensely intrusive and destructive conduct committed over the critically developmental years of this very young child's life.

A. Appellate Review of the Sentencing Court

Appellate review of this matter begins with the statutory prescription contained within 42 Pa. C.S.A. § 9781(b), directing that an appeal may be granted at the discretion of the appellate court only where it appears that there is a substantial question that the sentence imposed is not appropriate under this chapter. Thus, regarding the discretionary aspects of the sentencing, there is no automatic right to appeal. See *Commonwealth v. Cook*, 941 A.2d 7 (Pa. Super. 2007). The Defendant does not have a valid claim of excessive sentence without including an additional and more specific violation of the sentencing code. Only when a sentencing claim sets forth the manner in which either a particular provision of the Sentencing Code or an underlying fundamental norm of the sentencing process was violated, does a claim of excessiveness present a substantial

-28-

question. *Commonwealth v. Mouzon*, 812 A.2d 617, 620 (Pa. 2002). A blanket claim of excessiveness, with no further allegations, does not create a substantial question. *Id.*

Moreover, within this Commonwealth, the "imposition of a sentence is vested in the discretion of the sentencing court and will not be disturbed absent a manifest abuse of discretion." *Commonwealth v. Smith*, 543 Pa. 566, 673 A.2d 893, 895 (1996). This standard reflects that the sentencing court is "in the best position to determine the proper penalty for a particular offense based upon an evaluation of the individual circumstances before it." *Commonwealth v. Ward*, 524 Pa. 48, 568 A.2d 1242, 1243 (1990). Consistent with this standard of record review, the appellate court shall have regard for: "(1) the nature and circumstances of the offense and the history and characteristics of the defendant; and ... (3) the findings upon which the sentence was based." 42 Pa. C.S.A. § 9781 (d) (1) and (3).

As the instant record of the respective hearings conducted, this Court succinctly noted thorough incorporation and evaluation of all relevant sentencing factors. Prior to the formal sentencing hearing, this Court had reviewed all submitted relevant sentencing materials including the mental health evaluation and the presentence investigative reports that had been previously ordered and the recommended sentencing guidelines promulgated by Pennsylvania Commission on Sentencing.

This Court incorporated the felony grading and offense gravity score of each offense. The parties, by and through their respective counsel, acknowledged the Court's assessment that the lead first degree felony offenses had been assigned an offense gravity score of fourteen (14) and that Appellant's prior record score was a four (4). (N.T. 05/31/2019 pgs. 8-9). Thus, as agreed, as to each first-degree felony offense, the statutory limit was within the recommended standard guideline range of possible sentences. This Court additionally identified its review of the

Sentencing Memorandum submitted by the Commonwealth's counsel and the mitigation data submitted on behalf of Appellant introduced predominantly by family members. At the sentencing hearing, this Court considered the mitigating arguments made by defense counsel, which included references to Appellant's family ties while acknowledging his prior unofficial but documented employment as an illegal narcotics dealer. Appellant was given the opportunity to allocate. He utilized this time to claim that he had been nothing more than a loving and faithful step-father to A.J. and father to his other children.

This Court also measured the prosecution's argument that referenced the tremendous amount of mental damage that Appellant had purposefully and frequently inflicted upon this very young victim over a critical time period in her life. The harm to her was life-altering. Indeed, the circumstances surrounding the ultimate disclosure demonstrated that this seven-year old child had been taught to perform oral sex upon male penises upon request. The risk to her future is immeasurable. This Court was reminded also of Appellant's abuse of the trust that the victim's mother had placed within him. This Court recalled the significant toll that his remorseless brazen conduct caused and the potential threat that he had presented to the community, particularly children.

After acknowledging thorough consideration of all relevant sentencing factors, this Court succinctly recited in summary the sound rationale for the consecutive imposition of the respective sentences for each crime committed upon the child victim as follows:

> THE COURT: Mr. Rosser, I presided over this trial and I listened, very much, to everything everyone had to say. I found the testimony to be most credible. I found the impact upon A.J. is lifelong.
> You took advantage of a child who was already in a difficult situation in life. There is a cost to that.
> I reviewed the investigation report, and I have taken note of the previous attempts to rehabilitate you, going back to when you were a juvenile.

I do note that there's an indication of special needs in reference to you. I do take into consideration of the fact that, as a juvenile, three arrests, two adjudications of delinquencies for drug dealing, two commitments to the various placements to help rehabilitate you, followed by probationary supervision.

As an adult, you've been arrested nine times, convicted once for the current matter. You have three open treatment court cases reflective of matters charged with dealing narcotics. All three of them.

I take into account the guideline calculations and the severity of this case.

There is no penalty to taking a trial. Certainly not. But there is no assumption of responsibility here. No remorse exhibited or your actions. So that point that would have been in your favor is off the table.

I have reviewed the mental health assessment with respect to you as well. You do have a history of a learning disability.

You reflected that as a youth growing up was not a good one. I note that you did tend to your father when he was with you. I take all of that into consideration. ..."

(N.T. 05/31/2019, pgs. 15-17)

This Court further imposed the respective state supervised periods of confinement, conditions of sentence, accorded credit for custodial time served and informed Appellant of the SORNA Tier III Sexual Offender lifetime registration and other requirements. (Id. at pgs. 13-25) Post verdict rights were properly provided to Appellant by his counsel.

The record demonstrated that this Court duly considered all relevant sentencing factors presented as they applied to each individual offense. This Court as the presiding jurist, had a front row seat to the overwhelming evidence that proved Appellant had repeatedly committed each felony grade offense for which Appellant had been convicted. He acted purposefully with premeditation and without any care of the consequences. To the contrary, he remained remorseless.

Further, tremendous impact of Appellant's continuing predatory course of deviant conduct had upon this victim, his step-daughter, as well as the rippling harm upon the trusting members of her family was a driving sentencing factor. The resulting harm that Appellant had inflicted his victim was immeasurable. Even early on, the negative effects of his continuing criminal conduct was observable to A.J.'s mother, to the interviewers and to the diagnosing and treating personnel.

The behavioral and personality changes to this child, during these critical foundational childhood years, were well-documented. This child had been subjected to constantly feeling fear, helplessness, shame, isolation, confusion and loss of self-worth and control over her body. She was taught by "Big Steve "that performing oral sex was normal, expected behavior.

As the presiding trial judge, this Court recalled the unique circumstances regarding Appellant's grooming methods. This Court recalled that Appellant had manipulated his solid reputation and position within the community, particularly within his family, to take advantage of this child as her mom tried to financially support her family while he sat in her home jobless. He had portrayed to her an apparently convincing facade to cultivate this vulnerable and innocent young child into someone who would repeatedly satisfy his sexual desires.

Finally, this Court also measured Appellant's exhibition of zero repentance for his behavior. After voicing a thorough incorporation and evaluation of all relevant factors, this Court found that Steven Rosser had posed a serious threat to the community, especially to children in the future. In short, the individually imposed sentences as applied to each repeatedly committed offense and that addressed the harm done, were warranted.

B. Appellate Review of Aggregation in Sentence

Similarly, pursuant to 42 Pa. C.S.A. § 9781(d)(1) and (3), this Court operated within its discretionary right to impose the sentences consecutively. The sentencing court's exercise of discretion by imposing consecutive as opposed to concurrent sentences is not viewed as raising a substantial question that would allow the granting of allowance of appeal in our Commonwealth. *Commonwealth v. Marts*, 889 A.2d 608 (Pa. Super. 2005).

In the instant matter, individualized consecutive sentences upon Appellant had been imposed only after careful consideration of all relevant sentencing factors including the paramount

need for protection of the public, the gravity of the offense, and Appellant's poor prospect of rehabilitation. Imposition of consecutively running sentences for three of the four felony graded offenses directly resulted from the overwhelming evidence that Appellant repeatedly committed each offense. Further, the fact that he chose to harm this child when he was just under thirty years old, did not warrant a sentencing reduction. Thus, Appellant had not raised any substantial question that the consecutive sentences imposed had been inappropriate or contrary to a fundamental norm underlying the sentencing code.

Additionally, the weight given by the Court to the individual relevant sentencing factors is not a substantial question because this simply raised a disagreement about this Court's determination of facts and the weight of factors. Again, the sentencing court is given broad discretion in formulating a sentence, with no automatic right of review available. *Commonwealth v. Mastromarino*, 2 A.3d 581, 585 (Pa. Super. Ct. 2010). An appeal can only be granted if there is a substantial question as to a violation of a specific sentencing code or a fundamental norm. 42 Pa. C.S.A. § 9781; *Mouzon*, 812 A.2d at 627.

## C. Appellate Review: Applying Standard of Abuse in Discretion

Even if the reviewing court found a substantial question, the sentencing court's determination can only be overturned for an abuse of discretion. *Commonwealth v. Walls*, 926 A.2d 957, 961 (Pa. 2007). Such an abuse is not just a mere disagreement. *Id.* It must be "manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will." *Id.* This standard is embodied in the language of section 9781(c), which dictates that when sentencing outside the guidelines, a sentencing court's determination must stand unless the sentence was unreasonable. 42 Pa. C.S.A. § 9781(c).

A sentence is reasonable when it includes examination of the public protection, the crime's gravity, and the defendant's rehabilitative needs, as listed in section 42 of the Pennsylvania Code. 42 Pa. Cons. Stat. Ann. § 9721 (West); *Walls*, 926 A.2d at 964. Additionally, when the sentencing court has reviewed a presentence report, it is presumed that the court has considered the information it contains. *Commonwealth v. Boyer*, 856 A.2d 149, 154 (Pa. Super. Ct. 2004) *aff'd* 891 A.2d 1265 (Pa. 2006). Facts can be considered, pursuant to § 9721(b)'s sentencing requirements, even if the facts are subsumed within the guideline recommendation. *Commonwealth v. Sheller*, 961 A.2d 187, 192 (Pa. Super. Ct. 2008).

Per the statutory authority of our Commonwealth's duly elected legislature, this Court was imbued with the ability to levy the sentences as imposed. None of the imposed Orders and Judgments of Sentence had illegally surpassed the maximum period of confinement permitted by each applicable statute. This Court verbalized more than once the fact that the recommended guideline calculations promulgated by the Pennsylvania Sentencing Commission had been duly considered. Moreover, the respective sentences that had been imposed for each individual consecutively running offense fell within those correctly computed and recommended guidelines.

As the instant record reflected, when sentencing Appellant Steven Rosser, this Court had duly evaluated all sentencing factors including his familial and social history, his past criminal conduct, rehabilitative efforts and needs, and principally, the gravity of Appellant's predatory conduct that entailed multiple forms of child rapes which reflected unequivocally the potential danger that he posed particularly to other children within our community. Thus, this Court acted well within authorized sentencing discretion.

IV. **The Order and Judgement of Sentence mandatory registration requirements imposed pursuant to "SORNA" were constitutionally sound.**

-34-

Within his *Statement of Matters Complained Upon Appeal*, Appellant argued that the "sentence was illegal, as PA SORNA is unconstitutional, violates due process and is punitive, and violates the Ex Post Facto Clause." This claim directly resulted from the state of legal flux created from the drastic departure of appellate views of the requirements mandated under SORNA by the Pennsylvania Supreme Court announced in *Commonwealth v. Muniz*, 164 A.3d 1189 (PA 2017) and the legislative and appellate responses to date. The appellate claim of unconstitutionality of the requirements imposed upon Appellant Steven Rosser, however lacked factual and legal merit particularly in view of the rational reflected by the Pennsylvania Supreme Court in its recent opinion and holding in *Commonwealth v. Butler*, ___ A.3d ___, No. 25 WAP 2018 (March 26, 2020) (Butler County)(Commonwealth Appeal) - which upheld the Sexual Violent Predator designation and related procedures.

## CONCLUSION

In reviewing the entire record, this Court finds no harmful, prejudicial, or reversible error. Accordingly, the Orders and Judgments of the trial court should be affirmed.

By the Court,

DATE: May 13, 2020

Anne Marie B. Coyle, J.

-35-